MISSOURI PACIFIC RAILROAD COMPANY *v.* BENNETT.

## Opinion delivered March 26, 1928.

1. CARRIERS—LIABILITY FOR DEATH OF CATTLE.—Under allegations that a carrier accepted cattle for shipment knowing that part of them were weak and thin, and which should have been kept separate from bulls and steers, but that the carrier carelessly turned the cattle together, causing the death of 24 cows, evidence *held* to sustain a finding that the injury to the cattle resulted from the railroad's negligence.

2. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—A verdict supported by substantial evidence is conclusive on appeal.

3. CARRIERS—INSTRUCTION AS TO NEGLIGENCE.—Where a shipper alleged that the railroad accepted cattle for shipment knowing that some of them were thin and weak, and that it carelessly turned the weak cattle with bulls and steers, thereby causing the death of 24 cows, defendant's request for instruction that defendant was not required to furnish separate pens for weak and thin cattle, and that, if the jury found from the evidence that the cattle were killed in pens through no carelessness of defendant, the verdict should be for it, was properly modified by adding that, unless the jury found defendant negligently turned strong cattle in with the weak, causing the injury complained of, it would not be liable.

4. TRIAL—REFUSAL OF INSTRUCTION IGNORING ISSUE.—Where a shipper alleged that the railroad accepted cattle for shipment some of which were weak and thin, and that it was necessary to separate them from the bulls and steers, and that, while the cattle were in the railroad's custody, it carelessly turned them together, thereby causing the death of 24 cows, it was proper to refuse defendant's instruction that, under the rules of the experiment station, the railroad was not liable for injury of the stock in quarantine pens while being held to be dipped, and that, if the cattle died in pens while being dipped, it was not liable, such instruction ignoring the question of the railroad's negligence in mixing the weak with the strong cattle.

Appeal from Faulkner Circuit Court; *W. J. Waggoner,* Judge; affirmed.

*Thomas B. Pryor* and *Harvey G. Combs,* for appellant.

*R. W. Robins,* for appellee.

MEHAFFY, J. The appellees, plaintiffs below, filed a complaint in the circuit court, alleging the delivery to

the appellant, defendant below, at North Little Rock, of a shipment of 242 head of cattle to be transported by the defendant to East St. Louis, Illinois. That the defendant accepted said cattle for shipment. It is alleged that some of the cattle in said shipment were weak and thin, and it was necessary that they be separated from the bulls and steers, and that the defendant had notice of these facts, but that, on January 8, 1927, the cattle having been delivered on the first of January, while said cattle were in the custody of defendant, it carelessly and negligently turned said cattle together, thereby causing 24 of the said cows to be killed by the bulls and steers. Said cows that were killed were of the average value of $25 each, and, by reason of the negligence of the defendant, plaintiff prays judgment for $600.

Defendant filed answer, denying specifically each material allegation in the complaint.

There was a jury trial; and a verdict in favor of the plaintiff for $350, and judgment for that amount, from which this appeal is prosecuted.

The plaintiff's testimony tended to show that the cattle were delivered to and accepted by the defendant on the first day of January; that they were all right, and none crippled; that the bulls and steers were put to themselves, and the yearlings and small cows to themselves; that when Bennett, the plaintiff, was in North Little Rock, on the 8th or 9th of January, they were all mixed up, and a portion of them dead. Some of them trampled to death, some were hooked, and some of them had lost their calves. They were crippled up in every way they could be. That plaintiff arranged for six pens, and paid $15 per pen. That it was arranged with the stock foreman to keep the thin cattle separate. It is not good practice to put bulls and steers in a close pen with calves and weak cows. That 24 of them died as a result of injuries. The cattle were dipped, and none died from dipping. When they were unloaded they were all put in pens together, but were cut out as quickly as plaintiff

could cut them out. The average pen holds a car of cattle. The steers and bulls were loaded together. There was a load of small yearlings in the shipment. Some of them were thin and weak. The weather was cold at the time of dipping, and the cattle were held for two dippings. Some of them might have died from dipping, but those that were trampled, smashed, did not. Twenty-six were crippled. The cattle came from Louisiana, a tick-infested area. The shipper signed the usual shipper's uniform contract. The contract signed was the one prescribed by the Interstate Commerce Commission. The contract was here introduced, and plaintiff Bennett admitted that he signed it, and admitted making the affidavit required by the provisions of the Arkansas rules and regulations and the supplemental regulations issued by the Department of Agriculture for the movement of cattle from tick-infested areas.

After the cattle were unloaded they immediately cut out the weak, thin cattle, and put them to themselves. Did not rent any pens, but understood they were to have six pens. They had six carloads of cattle. The railroad company does not dip them, but they are dipped by the government. Witness later found them in four pens. One pen had weak cattle, and in the others they were all mixed up.

Another witness testified that the cause of the death of the 24 cattle was fighting and being ridden by big males. They were getting along all right until they were turned together. Does not think they died from dipping, and testified that the average cost of cattle was around $26. They shipped the big and the strong and the weak all together. They were unloaded together, and, after unloaded, the stock foreman was requested to separate the cattle, or permission was requested from him to separate the cattle, and he directed them to go ahead and do it. It is not true that most of the cattle that died were weak.

On the day after they came to North Little Rock the weak ones were separated from the steers and bulls. There was evidence of the cattle having been trampled. The evidence on behalf of the defendant tended to show that this was a mixed load of cattle, some big ones and some weak and poor. It was just a mixed shipment. That they were held for two dippings, from seven to twelve days. A government inspector does the dipping. The railroad company has nothing to do with it. They furnish the pens, and the shipper pays for the feed. After they had been there a day or two, the shipper asked if he could get pens to separate the cattle. Witness told him it was all right, but they would probably have some heavy shipments on Saturday, and if they did, they would have to put them back together, so they could have the pens for other stock. They were separated in seven or eight and sometimes nine pens. When they were separated, the weakest ones out of each car were put in a pen by themselves. They wouldn't get anything to eat when with the other cattle. Some of the cattle in that pen died after the first and before the second dipping. It was cold and rainy. The cattle came on the first of January, and they were taken out on the 12th. They were dipped the second time on the 10th. On the night of the 7th six carloads of other cattle arrived there, and twelve loads on the morning of the 8th, for dipping. Defendant has 20 quarantine pens with sheds, and four open. After the cattle are dipped, they must be put in a covered pen. Every shipper of live stock signs a uniform live stock contract, the one introduced here. The pens are locked, and the railroad employees keep the keys, but they are under the jurisdiction of Federal officers. Railroad employees transferred the cattle.

The testimony of the plaintiff in rebuttal was to the effect that the cattle were in four pens after they were rearranged by the railroad company. One pen contained, as nearly as they could pick them out, the weakest. The hurt and crippled ones were in another pen. They were

shipped all together. They were getting along all right before the railroad company changed them up, and they didn't die from those injuries. Some of the cattle died from being trampled.

The person who fed them testified that he found the cattle trampled up and crowded pretty bad. It appears that there were too many in the pens. The bulls and steers were mixed up generally with the weak and thin cattle. The cattle that were down appeared to have been trampled and gored. Some of the cattle were weak and thin. One pen of weak thin cattle were put together and kept together until morning, when they were all mixed up. It was not big steers that were killed. One of the steers died. At one time, while witness was feeding them, they were in as high as seven pens.

Appellant insists for reversal of this case on the ground that the defendant acted as a person of ordinary prudence would have acted under the circumstances, and we think that the only question for this court to determine is whether there was any substantial evidence upon which the jury might have found that the injury to the cattle resulted from the negligence of the defendant. If there is such evidence of negligence, this would justify the jury in finding a verdict in favor of the plaintiff.

The plaintiff introduced testimony to show that, when they delivered the cattle to the railroad company, they were all right, and none of them crippled, and that the bulls and steers were picked out and put to themselves and the yearlings and small cows put to themselves, and that on the 8th or 9th they were all mixed up, and a portion of them dead. The testimony shows that it is not safe to put the bulls and steers with the weak cattle and calves, and that, after they were delivered to the defendant, they were all mixed up, and there is no testimony tending to show that, even when the railroad company had to have some of its pens, the bulls and steers which caused the injury might not still have been kept to themselves, and not mixed up with the weak cattle.

Whether or not there was any negligence in this respect was a question of fact for the jury, and its finding is conclusive on this court.

The evidence of negligence is rather meager, but that is not a question for this court, if there is any substantial evidence to support the verdict, and we think there is some substantial evidence upon which the verdict of the jury could be based.

It is next contended that the court erred in its refusal to give instruction No. 1, requested by the defendant. That instruction is as follows. "The court instructs you that the defendant is not required to furnish separate pens to separate the weak and thin cattle from the strong; and if you find from the evidence in this case that the cattle were killed in the pens in North Little Rock through no carelessness or negligence on the part of the defendant, its agents or employees, then your verdict must be for the defendant."

The court refused to give the instruction as above set out and as requested by the defendant, but added, "unless you further find that the defendant negligently turned the strong cattle in with the weak, causing the damage complained of." We think the instruction as given by the court was correct. Whether the defendant was required to furnish separate pens to separate the weak from the strong or not, if it did do that, and then negligently turned the strong cattle in with the weak, causing the damage complained of, it would be liable, and there was no error in the modification of the instruction.

It is also contended that the court erred in its refusal to give instruction No. 2 requested by the defendant, which is as follows: "The court instructs you that, under the law and rules promulgated by the Board of Control of Agricultural Experiment Stations, the railroad company is not liable for damages where stock is injured and dies in quarantine pens in North Little Rock, through no carelessness or negligence of the defendant, its agents or employees, while being held to be dipped,

and if you find from the evidence in this case that the cattle died in said quarantine pens, while being held to be dipped, then your verdict must be for the defendant.''

The above instruction ignores the question of negligence, which defendant denies, the latter part of the instruction stating to them that, if they died in the pens while being held to be dipped, the defendant was not liable. That would be true if there was no negligence which caused the injury. But if they were separated, and the defendant afterwards negligently put them together, and this negligence caused the injury and damages, the defendant would be liable.

Instruction No. 1, given at the request of the plaintiff, was as follows: ''The court instructs the jury that, under the law, it was the duty of the defendant to use reasonable care in the handling of the cattle belonging to the plaintiff, and if it failed to use reasonable care in the handling of said cattle, and they were injured as a result thereof, then you should return a verdict in favor of the plaintiff.''

That submits the question squarely to the jury, and directs them, if the injury was caused by the negligence of the defendant, to find for the plaintiff; no matter what their duty was with reference to furnishing pens or keeping cattle to be dipped, if they were guilty of negligence in mixing the cattle as they did, and that negligence caused the injury, they would be liable. If it was not guilty of negligence, there would be no liability. But, having undertaken to keep the cattle, and having been notified that the bulls and steers must be kept separate or injury would result, then if, after that notice, the defendant's employees negligently or carelessly mixed the cattle, and that negligence or carelessness caused the injury, the carrier would be liable. And in all of the instructions given by the court the jury are told that, if the defendant was negligent, plaintiff could recover, and it was made perfectly clear to them that the defendant was entitled to a verdict in its favor unless the proof

showed negligence on the part of the defendant that caused the injury. They were properly instructed as to what constituted negligence, and in fact there is no controversy between the parties as to what constitutes negligence, both parties agreeing that, if the defendant failed to exercise the care and diligence that an ordinarily prudent man would exercise under the circumstances or under similar circumstances, they would be negligent.

The jury were properly instructed. It was made perfectly clear to the jury that, before the plaintiff could recover, the evidence must show that the defendant was guilty of negligence which caused the injury, and that if the evidence did not show negligence on the part of the defendant, plaintiff could not recover. And, as we have already said, the question of whether or not the defendant was guilty of negligence was a question of fact, and we think the evidence is sufficient to support the verdict, and the case is therefore affirmed.